We'll start with 18-6102 and 18-6165. Tudor v. Southeastern OK State University. We have 20 minutes to a side assigned in this case, and I believe an appellant wants to share five minutes with amicus, so we'll see about doing that. So, Ms. Weiss, I think you're first. Shall I may please the court. I'm Gillian Weiss. I represent Dr. Rachel Tudor, who received a jury verdict in her favor, finding that the university and the regional university system of Oklahoma engaged in sex discrimination when it denied her tenure and engaged in sex discrimination and retaliation when it denied her an opportunity to reapply for tenure. The major issues we'd like to address here are three. First, she moved her reinstatement, which was denied, primarily based on error of fact because of alleged hostility, which is not based in the record, which boils down to the university saying, we don't want you here. Second, a remittiture was granted from $1.2 million to about $360,000, primarily because of errors of law regarding statutory caps and mitigation. And third, front pay was set at about $60,000, which is based on errors of both law and fact. I will discuss the first two, and my colleague, Ms. Erica Lai, representing National Women's Law Center and other amici will address front pay, and we're requesting that this court order Dr. Tudor's immediate reinstatement with tenure, which is the only reinstatement. The court below abused its discretion because there's no record evidence of hostility. The hostile work environment count was declined by the jury. She wants to go back. Everyone who's had a problem has left, and the university now has some of the best transgender policies anywhere. They explicitly agreed to protect Dr. Tudor in their compromise agreement with the Department of Justice, and the court below failed to consider some important special circumstances of Dr. Tudor being a fully enrolled member of the Chickasaw Nation of Oklahoma, specializing in Native American literature of Oklahoma, at a Native American serving college on Chickasaw land, who had to move to Texas to find a job teaching in a two-year community college, and now has been banned by the Oklahoma Attorney General from any Russo institution because she won her jury verdict. As this court said in Jackson, reinstatement is the remedy that is required, except in extraordinary circumstances. Those circumstances do not exist here. Does that change when we're dealing with reinstatement with did the courts get involved in deciding who should get tenure? Oh yes, they absolutely do, and a number of them have done so. You know, most notably the First Circuit in the Brown decision in which they said that the university's right to grant tenure and freedom is not given the right to Ms. Weiss, along that very same line that Judge McHugh asked, I was intrigued that on your reply brief you made a statement that we could consider an alternative of reinstatement without tenure. Tell me, tell the panel how that plays out. Is that something you are urging us to consider as an alternative, or it just kind of popped in there in the reply brief, and I'd like to know how you're standing on that given that Judge McHugh's already raised the tenure question. Well, reinstatement without tenure would be equivalent to reinstating her on probation, which would not be suitable, as this court has said previously. And yet your reply brief said that that would be an acceptable alternative. Understood, and the court may feel that for whatever reason they do not wish to reinstate her with tenure. However, we would urge that with tenure is the appropriate remedy. If it was reinstated without tenure, what would be the future of your client? Because don't they have an up-and-out policy? If you aren't tenured by seven years, you're out, so wouldn't she still, if we had reinstated her without tenure, wouldn't she still be then up against the up-and-out policy? Or is this presupposing that the university would have incorrectly applied its policy in the first place? It would have to remedy that by allowing her sufficient time to regain that tenured status. That is, to apply for it. Certainly. If it was reinstated without tenure, she would have to apply. And then they would make the decision on tenure at an appropriate time that would be fair for her. We're going to apply the law. I just was intrigued that that kind of popped in in the reply brief, and I wanted to just ask you about it, so you proceed with your argument. Well, certainly, and part of the reason why that issue was brought up is because there are some special circumstances here that are extremely important. The Supreme Court has said that the most complete relief possible must be afforded to a victim of discrimination, an albemoral paper versus moody. She is, as I mentioned, a fully enrolled member of the Chickasaw Nation. Her people had to endure the Trail of Tears. Southeastern Oklahoma is the homeland of the Chickasaw people. Southeastern is within the historic boundaries of the Chickasaw Nation. And as Dr. Tudor herself has written in her scholarship, it is a special place with no directly, and she had to relocate to Texas, which really was something that moved her out of her historic homeland. It's a Native American serving institution under federal law, and the Supreme Court has recently—oh, I'm sorry. Well, I was going to ask you one other question because I'm just concerned about time. It's not on this point, but just very quickly, just giving you a short answer. I won't ask a follow-up, but if we agree that the salary—that the cap, not the salary cap, but the damages cap applies, does that moot a lot? And if we decide not to do reinstatement, does the damage cap moot a lot of your other damage calculation arguments? Doesn't it cut out a lot of those other claims? The damage cap was incorrectly applied. Is that the question you're asking? I'm asking you to assume for a moment that we feel it should have been applied, that it was correctly applied. If we agreed with that, then does that moot or abrogate a lot of your other damages arguments on calculation of amount of damages? Well, it doesn't because the back pay was incorrectly calculated, and it should have been about $228,000. The court awarded about $60,000. So your back pay would still—that would not be mooted by the salary cap. I mean, the damages cap. But everything else would be. Is that correct? Everything else? Meaning what? All the damages claims. Any other damage calculation for front pay? Oh, well, no. Front pay is completely separate. The front pay is outside of the caps, and we know that. So regardless of the application of any caps to back pay, which it shouldn't have been, front pay has nothing to do with any caps. So you believe that the damages cap has no impact on your other damages arguments? Yes, that's correct. With regard to front pay, for example. All right. Thank you. You proceed. Thank you. Ms. White, when you began your argument, you stated that the denial of reinstatement by the district court was based on incorrect fact findings, fact findings without evidence, essentially. What about the testimony by Randy Pruse? Ms. Tudor seemed to think that he was—she had no problems with him personally, did not think he was bigoted. And yet he said that at least half the faculty opposed her possible return. They didn't have the money for another position. How do you respond to that testimony? And correct me if I've mischaracterized the testimony. Well, I would say that his testimony is different from what you just stated, Judge Harts, because what he said in Dr. Tudor's appendix at volume 8, page 9, was that he believed that few people would object for a variety of reasons. But he didn't say anything about hostility or what their reasons were. He himself said he had no problem with Dr. Tudor, and he even said she qualified for tenure in 2010. So that is based on an incorrect understanding of his statements. And many other people there indicated they would welcome her back. As a matter of fact, the American Association of University Professors chapter at Southeastern wrote a letter requesting her reinstatement just recently. So, you know, that issue of is there hostility and do they have money for it? Well, they were advertising until recently for a position there. I mean, this isn't in the record, obviously. But, you know, the question of do they have room for Dr. Tudor? They do. But more importantly, when we think about, you know, what should be done with regard to reinstatement, the offer of reinstatement on probation, you know, which would be equivalent of not granting her tenure, would be unsuitable. That's why the Collin Community College job was unsuitable. Let me ask another question about hostility. The judge also based his decision, as I understand it, you can correct me again, if you think I've misstated it, is he thought that the tenor of the litigation indicated such hostility that it would be hard for them to maybe I'm reading behind between the lines there. But how do you respond to that? Well, what Judge Crawford referred to below was what we call litigation adversity, as this court knows, from the example in Jackson v. City of Albuquerque from 89. You know, the fact that credibility attacks or adversity or, you know, making arguments against the other side occur, that is a natural byproduct of any litigation, as the Eighth Circuit noted in Taylor v. Teletype in 1981. And it has to be irreparable acrimony that rises to the level at which the party's relationship is irreparably damaged, as the Fifth Circuit recently said in Bogan v. MTV Consumer Group. And in Jackson, for example, if you look at that situation, there was unprofessional and derogatory language, there was burglary of a file from an attorney's office, there were comments in the newspaper after the trial, there were threats of further litigation. And yet the court said, you must reinstate that, you know, is required and accept under extraordinary circumstances. So simply the fact that there was some back and forth between the parties, certainly there were heartfelt positions, but the university's cases do not support their position. In those cases, the professors were disapproved at the department and all college level. Here we have a professor who was approved by all the professors in her department, who was approved by the all-college committee. And when it got to administrators, you know, she complained, and so they said no tenure. That's what the jury found. And so, for example, Villanueva that they mentioned from the First Circuit, Broussard-Narcross from the Eighth Circuit, you know, Gordon Nix from the Sixth Circuit, all of these involve situations where the professors were not approved by anybody. So, you know, that is not really a consideration from our point of view. And, you know, I would like to reserve some time for rebuttal and some time for my colleague to discuss front pay. I'm happy to answer any other questions, but if not, I will just make a short closing and allow counsel for Amiki to speak. So, the points that I would like to make in closing are that essentially the university wants to re-litigate the jury verdict. The jury didn't buy it, and neither should you. Reinstatement is a basic element of the appropriate remedy in wrongful employer discharge cases, and except in extraordinary cases required, Jackson v. City of Albuquerque, the actors who had caused the problem are all gone. An offer of reinstatement on probation, i.e. without tenure, is not suitable employment. And the caps, if they apply, were improperly calculated because the back pay should have been about $228,000, leaving a non-pecuniary damages of $937,000. This is based on the associate rates that she should have received and benefits, plus the removal of her back pay from the time she left Collin Community College until the date of the verdict. It was an error of law to determine that those Title VII caps were unwaverable. They never raised them in any of the many answers that they brought up, and you can see information about this at Dr. Tudor's appendix in Volume 5. Let me interrupt you on one point, please. Did I understand you to say that the loss of pay until the verdict is all considered part of back pay, not front pay? That's correct. That's clear from the Supreme Court's ruling. So, the last point I'd like to make is that, as this Court said in Jackson, sometimes money cannot make one whole. Money cannot cure Dr. Tudor's rejection and exile from Oklahoma. Thank you. Miss, is it Lai or? Yes, Your Honor. May it please the Court, Your Honor? Erica Lai from Cohen & Gresser on behalf of Amicus Curiae, the National Women's Law Center, which is supporting Dr. Tudor in this matter because it has an interest in ensuring that plaintiffs that win jury verdicts on gender discrimination and retaliation claims are awarded complete relief. We are weighing in on only reinstatement and front pay. As to reinstatement, we agree with Dr. Tudor, for all the reasons discussed by Ms. Weiss, that this case simply does not present such extreme hostility as to render Title VII's presumptive remedy infeasible. Even if front pay were the appropriate award, the District Court abused its discretion in awarding only 14 months for the time period between Dr. Tudor's termination from a tenure-track role as a professor at Southeastern and the non-tenured contract-level position that she had at Collin College. The District Court failed to consider four critical factors. First, the overwhelming evidence that the Collin College teaching position was substantially inferior to the tenure-track position that she had at Southeastern and should not have been used to cut off front pay. Second, the lack of... your idea of determining whether they found a comparable or adequate job. I can buy that when we look at economic matters, like was it a comparable pay? Was it comparable tenure for her pay? But when you ask us to get into subjective things, like was it this comparable reputation? Was it a comparable-sized office? Was it located with Indian tribes? All of those things, I don't know that there's case law that really warrants or at least compels us to consider a lot of those much more subjective and hard to quantify factors. Well, Your Honor, I think what you're getting to is that the front pay analysis is necessarily one that is predicting the future and how long Dr. Tudor would be working in the preferred and presumptive remedy under Title VII as it's the only way to make her whole and to make sure that she is, in fact, awarded a remedy that fully accounts for the discrimination that she suffered. But even insofar as one looks at compensation, the salary that the district court took into consideration was only the salary that Dr. Tudor had prior to obtaining tenure, which the jury had found that she would have received had she not been discriminated against on the basis of gender. Her salary, as the record shows at volume four, pages 217 to 21, would have been in the neighborhood of around $74,000, and that would have been much higher than the ultimate salary that she had at Collin College. But you have a problem. She made a statement about a smaller salary amount that the district court relied on. Isn't that right? Yes, Your Honor. Although the calculation that ultimately supported that showed that it was only a calculation for a shorter time period than a full year, which is what the district court should have taken into account in really looking at a comparison of the salaries. But even objectively speaking, even a surface consideration of the Collin College position relative to the position that she had at Southeastern shows how vastly inferior it is given that it was not, in fact, a tenure-track position. The record is clear in this case, and it has been well recognized in other cases, that tenure is, in fact, the ultimate milestone in an academic's career. It enables not just a salary bump, but also job security. It makes an individual much more marketable. The status of it is significant. It involves scholarship and service as opposed to the Collin College position, which was only a teaching position, which were all reasons why the Collin College position should not have cut off the front pay award. But in addition, there is the lack of substantially equivalent work opportunities in Dr. Tudor's geographic area, the job market realities, which really make it much harder for an older Native American woman who is transgender to find comparable employment, and the black mark that now Dr. Tudor has to overcome from the discriminatory denial of her tenure. For all these reasons, Your Honor, the National Women's Law Center and the more than 30 women's rights groups that have weighed in in our support urge this court to vacate the denial of reinstatement and order Dr. Tudor reinstated with tenure. Let me ask you a question. You mentioned the black mark of the denial of tenure. Wasn't that erased by the jury verdict, that black mark? Well, no, Your Honor, because now, even now, when Dr. Tudor applies for jobs, she has to explain why she was tenure track, but did not, in fact, receive tenure at Southeastern as she's applying for new jobs. That is still a black mark on her resume that needs to be explained. And it makes her much less marketable, Your Honors. I see that our time is up. Thank you, Your Honors. Thank you. Okay, we'll turn to Apolli. Mr. West, you may begin. Good morning, Your Honors, and may it please the court. President Minx denied plaintiff tenure and the opportunity to reapply. Yet, throughout this case, plaintiff's theory has been that former Vice President Doug McMillan was the bad guy. In closing argument, plaintiff's counsel remarkably stated that, frankly, you'd think that a true man of faith might just come out and confess to doing the obvious, essentially calling McMillan a religious fraud for not admitting his guilt. McMillan's gone now, right? Yes, Your Honor. Aside from that statement being incredibly inappropriate and inflammatory, defendants believe that this quote actually illuminates the fatal flaws of plaintiff's case in nearly every aspect. It first shows that plaintiff lacked actual evidence by trying to make an assertion based on a lack of evidence. It shows that plaintiff utilized improper evidence by, among other things, attacking McMillan's religion repeatedly, and that plaintiff focused on the wrong person, President Minx, without seeking to... Sorry, Your Honor. Counsel, you say attacking McMillan's religious preferences repeatedly. Was there more than just that one statement you're referring to? Yes, and it's actually been repeated on appeal. Plaintiff has called... Let's talk about at the trial. Yes, at trial, plaintiff called McMillan's religious beliefs, I believe, peculiar, and then also elicited a very misleading testimony that indicated somehow that he was making employment decisions based on his religion. And then when it turned out later on cross-examination, those mysterious employment decisions were his helping a widow find a job. And so essentially, plaintiff was trying to use that to somehow prove religious-based discrimination here, the simple fact that McMillan used a widow to find a job. And then, at another instance, plaintiff then had the temerity to attack McMillan on the stand and say, basically, you're the one accusing McMillan of having brought up his religion when it was plaintiff that injected it into the testimony in the first place. This is plaintiff's counsel you're talking about, right? Yes, Your Honor, and that is true. Let's focus on... You have a jury verdict that says that your client denied Dr. Tudor tenure on the basis of sex because she was transgender. So, what you're arguing now, to me, seems to be a red herring. It's a very small part of a very big transcript, and I want to get to the issues that are before us on appeal here. Why isn't it appropriate to but for the discrimination, she would have tenure now at this university? Your Honor, with respect, we would assert that the religious attacks on Dr. McMillan are not a red herring and, in fact, are part of the underlying holding of the district court that reinstatement was inappropriate because of hostilities. Just to move this along, I agree completely with Judge McHugh, and it would be helpful, at least to two members of this panel, if you would get off that horse and move on to something else. Well, Your Honor, respectfully, I don't think I can get off the horse because that's one of the hostile... Go ahead. That is one of the hostile acts that underlies the district court's holding on reinstatement. The district court held that there were mutual hostilities in this case, which distinguishes that from Jackson. The Jackson case that plaintiff repeatedly cites found that there were one-sided hostilities. And then also, the Jackson case didn't have anything even remotely resembling Randy Press's testimony, as Judge Hartz has pointed out, where Randy Press was testified by both sides to be honest and trustworthy. And Randy Press has stated that for a variety of reasons, including the fact that half the faculty opposed reinstatement, that it would be bad for everybody involved. It would be negative for the university. Dr. Press testified... Dr. Press said that Dr. Tudor qualified for tenure. Correct? Partially correct, Your Honor. Dr. Press testified that Dr. Tudor did not qualify for tenure in 2009 and 2010, which is why he voted against it. He testified that as of 2010 and 2011, Dr. Tudor had qualified, but then in his affidavit, and as defendants have pointed out, as the district court held, in his affidavit, Dr. Press again emphasized that his initial decision was that Dr. Tudor did not qualify. And so, it's... Well, at the end of the day, Dr. Press said, I say she's qualified. Dr. Tudor is qualified for tenure. In 2009, or in 2010, 2011, we are now nine years later in the district... Okay, Dr. Press was one person who testified. There were also six current Southeastern professors out of a total of 12 in the department who all testified that they would welcome Dr. Tudor back and did not see any problem with bringing Dr. Tudor back. So, Dr. Press outweighs all the other testimony. Your Honor, that coalesces perfectly with Dr. Press' testimony. Dr. Press' testimony was that about half the faculty opposed reinstatement. So, the fact that Dr. Tudor is able to come forth with statements from about half the faculty potentially supporting or neutral on reinstatement completely coalesces with his testimony that about half the faculty oppose it. And again, Dr. Press' undisputed testimony in terms of his honesty and trustworthiness is that this will be bad for everybody involved. Let's talk about that. Is that a hearsay problem? Was there a hearsay objection raised? I mean, how can he testify what half the faculty believes? Your Honor, you're actually... Your first point is exactly correct. In the reply brief, plaintiff stated that this was hearsay, but there was no hearsay objection made below either in trial or to the affidavit. If you go look at the trial transcript... So, that's why that came in, because no objection was raised. There was no objection. Now, defendants would say it's not hearsay, but at the minimum, there was no objection. Okay. That answers my question. Thank you. Okay. Let me ask you this. If the goal of the statute is to make Dr. Tudor whole, and we have a jury that has found that Dr. Tudor was denied tenure because of discrimination, how can we make Dr. Tudor whole without reinstating Dr. Tudor? Respectfully, plaintiffs or defendants would point out that we believe that the district court's decision was that Dr. Tudor was made whole by a $300,000 jury verdict and then a $60,000... Well, it was a million-something jury verdict, right? Yes, which went far beyond the agreed-upon statutory cap that both sides agreed upon. But the district court's finding was that essentially half a million dollars did make plaintiff whole, especially in light of the fact that plaintiff did have substantial employment within two years at Collin County and worked there for four years and lost that job due to no fault of defendants whatsoever. How do you get around the fact that there is a strong statutory and judicially recognized presumption of reinstatement here? The reason for it is because there is so many nuances that cannot adequately be accommodated by a damage award. Your Honor, defendants aren't trying to get around that as much as just say the district court didn't abuse its discretion in denying reinstatement, having seen the hostilities here, such as the religious attacks. But if we look at discretion, the discretion the district court said was that there was too much hostility. And if we were to look at this record and say that the only evidence, the only evidence of hostility now was litigation stress, and that's in in in almost any litigation. Do you have any? I mean, I think that if there is no evidence to support that finding, that would not be a difficult call to say abuse of discretion. Your Honor, there is evidence for the finding. Again, going back to the litigation, what evidence is there outside of litigation? There is a here's a statement that some of the faculty would not welcome it, but that's not a statement that they wouldn't deal with her, that they wouldn't work with her, that there would be so much hostility they couldn't teach. That's none of that. Your Honor, it is a statement that this would be, again, from an honest arbiter who plaintiff is called honest, saying this would be negatively affect the students, the university and the faculty. And again, the faculty here, this is testifying from faculty that were not implicated at all in any of the discrimination accusations. So this isn't the discrimination. This is Dr. Press Texas testifying about the faculty itself, saying that it would be negative. It would negatively impact everybody in defendants simply with a statement that is would be negative, is is not responsive or equivalent to what the law requires, which is evidence of severe. Severe adversity in the relationship, even if we accept the best statement in its full force is simply doesn't meet the legal standard in the district court here, made a finding that there were severe hostilities present throughout the case based upon a single statement, basically based upon litigation conflict and a single statement that there's a certain number of faculty members that would not welcome based upon the testimony of somebody who's honest and presumption is reinstatement, then how can this happen? Well, the 10th Circuit has denied reinstatement multiple times in the past on this ground, and we would point. Well, let me let me jump in there, because in those cases, the person who was discriminated against was the person arguing against reinstatement as a remedy. It was actually the victim of the discrimination who wanted damages instead of reinstatement. To me, that's a big difference. Your Honor, respectfully, we disagree because in the stare at case in this case was cited in Jackson, the stare at case this court held that reinstatement could be could be denied. In that instance, based on the case like press of a single witness who testified that it would have that reinstatement would have negative effects. That was the stare at case from right around the same time as Jackson that was cited in Jackson. If we go this route, people can discriminate with impunity, and then say, we don't have to honor the tenure decision that was denied only on the basis of discrimination, because we don't want to work with this person. Doesn't that just reward the discrimination? It takes all of the teeth out of the statute. Respectfully, Your Honor, we would we would argue the opposite. If you if you force and say and can and say that this is an abuse of discretion here, not just de novo, de novo review, this court could very well come to the opposite conclusion. But to say that the district court abused its discretion by relying on somebody as honest and trustworthy as Randy Pruss. Why are you saying the other six professors weren't honest and trustworthy when they said we'd welcome her back? Well, that's brings up a good point that I wanted to get to your honor when you claim there are six when the plaintiff claims there are six professors. There was only one or two of those at trial. Three of those were submitted in affidavits in a reply brief below, which is inappropriate in the district court did not consider them. So I wanted to make that point as well, that there was one or two test professors who testified below. And as the district court found, Professor Cotter Lynch's testimony was was not based on actual knowledge of the plaintiff's teaching and various other things. But nevertheless, my original point was that if you if you say it's an abuse of discretion to rely on Randy Pruss's testimony here, as well as the hostility of the that doesn't coalesce with you rely on litigation hostility. There is probably never a case where reinstatement can be awarded. Because when people are litigating each other in a hotly contested matter, there's typically litigation hostility because lawyers aren't saints. Yes, Your Honor, but that's why we're not relying solely on litigation hostilities, but also on Randy Pruss's testimony. And one issue and one fact that we haven't talked about is the district court also agreed with and made some findings of fact regarding defendants belief based on post activity post 2010 activity of plaintiff, the plaintiff had not maintained anything close to the level of academic or academic performance or scholarship that that would merit coming back and not not relation not in relation to the pre the pre leaving of southeastern by plaintiff. But the district court also put stock in that in that is backed up by the record, especially by the Collin County record, which defendants can look at and have looked at and said that that is not that is not a good sign of being able to bring somebody back. The plaintiff lost a job at Collin County due to poor teaching and handling of students. I thought that the the test, the only test that we have to address, if we decide that preferred well, the law says the preferred remedy is reinstatement. And we have to honor that, unless adverse hostility is so extreme, that it's not feasible. And now you're trying to say, well, unless two things, unless the hostility is extreme, which you think you've got evidence about. And then secondly, we should take another look at whether they would just hire her on the first in the first place, whether she's maintained scholarship that she's currently valuable. But that second point really isn't part of the legal test for reinstatement, is it? No. Respectfully, Your Honor, we would disagree. The Acri case A. C. R. E. Y. from this court in 1992 stated that quote absence of mutual trust and then quote record basically denied reinstatement because of an absence of mutual trust or said that that could lead to a denial of reinstatement. And also that in that case, the record contains examples of sharply conflicting evidence about specific incidents reflecting on plaintiff's job performance. So the A. C. R. E. Y. But that there is nothing in the statement in the language that you've cited in A. C. R. E. Y. and I admit I haven't read that. But what you've cited, there's nothing in there that where the court said that you look at not only hostility, but you also look at whether they would have rehired this person just based on the current day merits or not. You know, the current, her life after she was denied tenure was turned upside down. And to expect that she would keep up normal scholarship when she didn't have a university anchor to support that is probably not very fair. Well, going back to Acri, Your Honor, it actually does explicitly say that there is sharply conflicting evidence about specific incidents reflecting on plaintiff's job performance or before or after she was terminated. I believe in Acri that was for after, but I would have to look back at the four. Okay, well, that's that's that was the point. Unless you know that, how can you cite that case to us? So I'm going to take your statement is simply here's another case I've drawn that you might look at. I'm not going to consider your advocating that at all for your proposition here, unless you can assert to the court that the court, the court said, we look at post termination conduct on whether the reinstatement is an appropriate remedy. Well, let me jump in on Acri. Acri is another one where the discriminated against employee was asking for damages instead of reinstatement. Correct? I believe that is correct, Your Honor, which is a huge difference. I mean, you know, if you've got the the person who's going to be reinstated saying, please, God, don't reinstate me, it will be a living hell. The court should consider that. Yes, Your Honor. And we and that's why we have not cited Acri as our primary case in terms of looking at the Starrett case is why we have cited a case where the district court denied reinstatement because one of plaintiff's own witnesses testified that it was a bad idea. We just simply point out that there is some language in Acri indicating that if there is sharply conflicting evidence about plaintiff's job performance, that it can possibly be taken into account in district courts. And this goes back to what what courts have repeated multiple times is that district courts are given extremely broad discretion to determine remedies. So, whereas in a case where the district court here had declared that reinstatement was the appropriate remedy, obviously, defendants would have a huge hill to overcome to show that that was somehow an abuse of discretion. But that discretion is broad. And when the district court finds, based on evidence such as Randy Press's and others, that that reinstatement is not appropriate, the district courts are given much leeway to make that kind of decision. Let me let me ask about the evidence or the reasons for hostility of people at the university, at the college. It would be one thing if the hostility to her return was that after she was denied tenure, she murdered somebody or turned to bank robbery or something like that. And there are certainly cases saying that even though there's discrimination, you don't have to rehire somebody if they've engaged or you've discovered that they engaged in misconduct. But if the hostility is simply people who thought she didn't deserve tenure or people who are hostile for bigoted reasons, then it's hard to see why that should prevent her being reinstated. Do we know anything about the reasons given for being opposed to her reinstatement? Yes. So, we know some. In Dr. Press's affidavit, well, in his testimony, he spells out there was a variety of reasons. In his affidavit, he mentions a lack of qualifications in his original vote. He mentions budgetary concerns, the fact that they the position. And then we also know, based on plaintiff's own structuring of this case, that I apologize, your honor, my time has run out. I don't want to answer the question. Okay. We also know, again, based on this case, plaintiff has never made any accusations that anybody, they can't possibly be bigoted because there's no accusations that anybody in the faculty, including Press, had anything to do with any of the incidents beforehand. So, the fact that half the faculty oppose it is almost per se, you can't say that that was in any way relation to bigotry because plaintiff has actually said repeatedly throughout this case and said, no, it's the faculty that was correct, not the administration. Thank you, your honor. Any other questions for members of the panel? Thank you. No. Okay. Thank you, counsel. The case is submitted.